UNITED STATES of America

v.

Anthony ACCETTURO, Michael Taccet-ta, Michael Perna and Thomas Ricciardi, Defendants.

Crim. No. 85–292.

United States District Court, D. New Jersey.

Oct. 18, 1985.

Thomas W. Greelish, U.S. Atty. by V. Grady O'Malley and Barbara Miller, Sp. Attys., Dept. of Justice, for the Government.

Milton Ferrell, Jr., for Anthony Accetturo.

Michael Critchley and Alan L. Zegas, for Michael Taccetta.

Michael D'Alessio, Jr., for Michael Perna.

HAROLD A. ACKERMAN, District Judge.

## I. INTRODUCTION

On August 19, 1985, a Federal grand jury, sitting in the District of New Jersey, returned a 12-count indictment against 26 individuals charging conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Section 1962(d), and conducting a racketeering en-

terprise in violation of 18 United States Code Section 1962(c), which included conspiracy to distribute and possession with intent to distribute cocaine and marijuana in violation of 18 United States Code Section 2 and 21 United States Code Section 841; conduct of an illegal gambling business in violation of 18 United States Code Section 1955; mail fraud in violation of 18 United States Code Sections 1341 and 2; wire fraud in violation of 18 United States Code Sections 1343 and 2; Hobbs Act extortion in violation of 18 United States Code Sections 1951 and 2; extortionate credit transactions in violation of 18 United States Code Sections 892–894 and 2; and extortion in violation of N.J.S.A. 2C:20–5.

This matter is before me today on the government's motion for revocation of the release orders entered for defendants Anthony Accetturo, Michael Taccetta, Michael Perna and Thomas Ricciardi under the Bail Reform Act of 1984, Public Law No. 98–473, Sections 202 to 210. 98 Statutes 1976–87, (codified at 18 United States Code Sections 3141–3150).

## II. THE INDICTMENT

Count 1 of the indictment alleges that the defendants conspired to commit a lengthy list of racketeering acts under the aegis of the Taccetta Group Enterprise, an organized crime group. The Taccetta Group Enterprise allegedly operated from 1976 to July, 1985 to commit crimes of loansharking, extortion, counterfeit credit card scams, illegal gambling schemes and extortionate business takeovers through the use of violence, threats, and physical and economic intimidation. The indictment describes the Taccetta group enterprise as a hierarchical body which depends for its existence on a carefully designed organizational structure and internal discipline. Moreover, the indictment alleges that the hierarchical scheme governs the conduct of members, dictates their respective statuses and provides an overall scheme for the commission of offenses on a collaborative and systematic basis.

The indictment also details the alleged roles in the Taccetta group conspiracy of each of those indicted. Anthony Accetturo, a resident of Hollywood, Florida, is the alleged leader of the enterprise and, as such, decides matters of overall policy and resolves disputes between associates of the enterprise. In return, he allegedly receives a percentage of the enterprise's profits in the form of, "tribute," payments.

Michael Taccetta is the alleged, "underboss," and chief executive officer of the New Jersey operations of the enterprise. In this capacity he allegedly reports directly to Anthony Accetturo, supervises day-to-day enterprise activities, resolves disputes, determines short-range policy and collects and disburses revenues obtained through the criminal activities of the enterprise. As compensation, he allegedly receives a share of the group's profits, as well as income derived directly from his own activities.

Michael Perna allegedly advises Michael Taccetta and functions as an intermediary between Taccetta and members of the enterprise regarding the commission of crimes. Thomas Ricciardi allegedly supervises and manages the installation and repair of certain illegal video gambling machines and collects the proceeds from the machines.

Count 2 of the indictment alleges that the 26 defendants operated in concert as an enterprise within the meaning of Section 1961(4) of RICO. An "enterprise," as defined by the statute, "includes any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 United States Code Section 1961(4). The Supreme Court has held that a completely illegal organization may satisfy this definition. *See United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

By incorporating the allegations of Count 1, which detail the alleged hierarchical nature of the Taccetta group, the alleged respective roles of each defendant and the overall coordination of criminal activity pro-

vided for by the group, the indictment attempts to outline the elements of a RICO enterprise laid out by the *Turkette* Court: "Evidence of an ongoing organization, formal or informal and ... evidence that the various associations function as a continuing unit." *Id.* at 583, 101 S.Ct. at 2528. Further, the enterprise must be shown to have in existence separate and apart from the pattern of activity in which it engages. *Id.*

The Third Circuit has further defined each of these elements in *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). There the Third Circuit said that the "ongoing organization" requirement refers to the group's superstructure. "To satisfy this element, the government must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis. This does not mean that every decision must be made by the same person or that authority may not be delegated." 709 F.2d at 222. The second element, the "continued unit" requirement, does not mean that the membership of the group remain static. Rather, it requires, "that each person perform role in the group consistent with the organizational structure established by the first element and which further the activities of the organization." *Id.* at 223. Finally, the third element requires proof that the enterprise has "an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an ongoing basis is adequate to satisfy the separate existence requirement." *Id.* at 223–24.

## III. DETERMINATIONS OF THE MAGISTRATE BELOW

The government has previously sought the detention of each of the four defendants at their initial appearances below. On August 21st, 1985 the government moved to detain defendant Accetturo before Magistrate Patricia J. Kyle in Fort Lauderdale, Florida. The government sought detention on two grounds. First, that Mr. Accetturo was charged with a violation of the Controlled Substances Act, 21 United States Code Section 801, et seq., and was, therefore, subject to the rebuttable presumption under 18 United States Code Section 3142(e), that no conditions of release can reasonably assure his appearance at trial and the safety of other persons in the community; and, secondly, that he was charged with committing crimes of violence (racketeering offenses involving loansharking and extortion), "while on pretrial release for two separate federal offenses and, therefore, posed a danger to the community through continued criminal activity. Magistrate Kyle denied the government's request for detention and ordered that Mr. Accetturo be released on $450,000 personal surety bond co-signed by his wife subject to several conditions. While I have read the transcript of the hearing before Magistrate Kyle, I do not believe it is necessary to detail what portions of the magistrate's reasoning I've accepted or rejected.

The government appealed the release order to Judge Norman Roettger of the United States District Court for the Southern District of Florida. Judge Roettger issued an oral order dismissing the government's appeal for lack of jurisdiction under 18 United States Code Section 3145, which provides that if the government seeks review of a magistrate's release order it must move for revocation of the order or amendment of the conditions of release with the Court having original jurisdiction over the offense.

Defendants Taccetta, Perna and Ricciardi were arrested and appeared before Magistrate G. Donald Haneke in Newark on August 21st, 1985. The government moved under 18 United States Code Section 3142(e) and (f) to detain Mr. Taccetta on the ground that he posed a danger to the community and under 18 United States Code Section

3142(f) to detain Mr. Perna and Mr. Ricciardi on the grounds that each posed a danger to the community and other persons. At the conclusion of the hearing, Magistrate Haneke denied the government's request for detention ruling that the government had not met its burden of establishing by clear and convincing evidence that the defendants posed a danger to the community either as potential threats to government witnesses or through potential continuation of criminal activities while on pretrial release. Magistrate Haneke's decision was not accompanied by factual findings. While I have also read the transcript of the hearing before the magistrate, I do not believe it is necessary to specifically detail what portions of the magistrate's reasoning I have accepted or rejected.

The government filed a motion with this Court on September 13th, 1985 seeking review of both magistrates' release orders as to defendants Accetturo, Taccetta, Perna and Ricciardi under 18 U.S.C. Section 3145(a). I held separate hearings on the government's motions on October 3, 4, 9, 10, 11 and 15.

## IV. THE BAIL REFORM ACT OF 1984

The Bail Reform Act of 1984 lays out a comprehensive procedure for effecting the release or detention of those charged with violations of federal law. The Act was enacted to revise the former statute, the Bail Reform Act of 1966, which was designed solely to consider assurance of the defendant's appearance at judicial proceedings in setting bail. See Senate Report No. 225, 98th Congress, Second Session, 3, (reprinted in 1984 in the United States Code, Congressional & Administrative News 3182, 3185 to 86).

In considering bail reform legislation, Congress, inter alia, noted the alarming problems of crime committed by persons on pretrial release and the former Act's failure to address this reality. 1984 United States Code, Congressional & Administrative News at 3185–3188. The Act's legislative history clearly indicates that the Bail Reform Act of 1984 is designed to address

this problem and give the courts authority to, "make release decisions that give the appropriate recognition to the danger a person may pose to others if released." Id. at 3185. Congress further stated:

"There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the powers to deny release pending trial.

"The decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. However, not only the interests of the defendant, but also important societal interests are at issue in the pretrial release decision. Where there is a strong possibility that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate. This rationale—that a defendant's interests in remaining free prior to conviction is, in some circumstances, outweighed by the need to protect societal interest—has been used to support court decisions which, despite the absence of any statutory provision for pretrial detention, have recognized the implicit authority of the courts to deny release to defendants who have threatened jurors or witnesses or who pose significant risks of flight. In these cases, the societal interests implicated was the need to protect the integrity of the judicial process. The need to protect the community from demonstrably dangerous defendants is a similarly compelling basis for ordering detention prior to trial."

Id. at 3189–90 (footnotes omitted).

Section 3142(f) provides that a judicial officer shall hold a hearing "to determine whether any condition or combination of conditions set forth in Subsection (c) will reasonably assure the appearance of the

person as required and the safety of any other person in the community in a case (1) upon motion of the attorney for the government that involves (A) a crime of violence ... (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act ... or (2) Upon motion of the attorney for the government or upon the judicial officer's own motion that involves (A) a serious risk that the person will flee; (B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten injury, intimidate or attempt to threaten injury, or intimidate, a prospective witness or juror." A "crime of violence", as used in Section 3142(f)(1)(A) is "an offense that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. Section 3156(a)(4)(A).

Section 3142(e) provides a rebuttable presumption that "no condition or combination of conditions will reasonably assure the safety of the community if the judicial officer finds there is probable cause to believe that the person committing an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, (21 U.S.C. Section 801 et seq) ..." This presumption shifts to the defendant the burden of production not the burden of persuasion. *United States v. Jessup*, 757 F.2d 378 (1st Cir. 1985); *United States v. Columbo*, 616 F.Supp. 780, 785, (E.D.N.Y.1985). Although the Act does not explicitly state what is necessary to support a probable cause finding to trigger the presumption, the Supreme Court has declared that a grand jury indictment alone is adequate to establish the probable cause necessary for the issuance of an arrest warrant. See *Gerstein v. Pugh*, 420 U.S. 103, 117, footnote 19, 95 S.Ct. 854, 865, footnote 19, 43 L.Ed.2d 54 (1975) and *Giordenello v. United States*, 357 U.S. 480, 487, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958). A presumption of regularity, of course, attaches to Grand Jury proceedings. *See In re Grand Jury Proceeding*, 632 F.2d 1033, 1040 (3d Cir.1980).

I have found no basis for determining that Congress intended to require the production of independent evidence to establish probable cause. Therefore, the Grand Jury indictment alone establishes the probable cause necessary to trigger the rebuttable presumption of Section 3142(e) *Contra United States v. Allen*, 605 F.Supp. 864, 869 (W.D.Pa.1985); *United States v. Fisher*, 618 F.Supp. 536 (E.D.Pa. 1985) decided by former Chief Judge Lord. *United States v. Allen* holds that a judicial officer must have a factual basis, independent of the fact that an indictment has been returned, upon which to make a finding of probable cause. Although I do not agree with that conclusion, the *Allen* standard is met in this case, as, I find, regardless of which standard one uses, I find there is independent evidence to trigger the presumption. In addition, the evidence as to probable cause far outweighs that found to be sufficient by Judge Lord in *United States v. Fisher*.

In determining whether release conditions exist which will reasonably assure the appearance of the defendant or the safety of any other person in the community, Section 3142(g) of the Act instructs the judicial officer to consider any information concerning the following:

"(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person including (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history related to drug or alcohol abuse, criminal history and record concerning appearance at court proceedings and (B) whether, at the time of the current offense or arrest, he was on probation, on parole or on other release pending trial, sentencing, appeal or completion of sentence for

an offense under Federal, State or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

If, after considering these conditions and holding a detention hearing, the judicial officer finds that no release, condition or combination of conditions will assure the defendant's appearance or the safety of persons in the community, the judicial officer shall order the detention of the defendant. *See* 18 United States Code Section 3142(e). If the judicial officer predicates his or her decision to detain the defendant on a finding of dangerousness to the community, the facts used to support such a finding, "shall be supported by clear and convincing evidence." See 18 United States Code Section 3142(f).

If the judicial officer decides to detain an individual pursuant to this Act, such detention order shall include, inter alia, written findings of fact and a written statement of the reasons for the detention. See Section 3142(i). A release order must contain a written statement setting forth conditions of release. See Section 3142(h). Finally, Section 3142(j) of the Act provides that "nothing in this section shall be construed as modifying or limiting the presumption of innocence."

The phrase "safety of any other person or the community," embodies the concept of dangerousness which Congress specifically intended the new Bail Act incorporate. The legislative history makes clear that this phrase encompasses more than just the safety of an identifiable person; for example, a victim or a witness. The word "community" refers to the potential for continued criminal activity on the part of the defendant that would endanger other unidentified persons. See Senate Report No. 225, 98th Congress, Second Session 12, reprinted in 1984, United States Code, Congressional & Administrative News at page 3195. Moreover, Congress intended that the concept of safety encompass more than freedom from the potential for physical violence. Senate Report No. 225 cites with approval the case in this circuit of *United States v. Provenzano*, 605 F.2d 85 (3rd Cir.1979) to illustrate that the concept of danger extends to such non-life-threatening harms as corrupting a union. See Senate Report No. 225 at pages 12 and 13 reprinted in 1984 in the United States Code, Congressional & Administrative News at pages 3195 and 96.

Chief Judge Weinstein's recent opinion in the Eastern District of New York in *United States v. Columbo* cited supra provides us further guidance on this concept in the context of an alleged organized crime enterprise. Chief Judge Weinstein stated:

"The (Bail Reform Act of 1984) does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order. Nor does the statute suggest that if a defendant has the ability to endanger the community vicariously from a prison cell, through orders to his underlings, detention is inappropriate. Leaders of criminal gangs who direct the commission of violent crimes by others can be detained prior to trial under the circumstances prescribed in the Act. A warden is in a position to inhibit criminal activities in jail by criminal overlords." See page 785 of that opinion.

## V. STANDARD OF REVIEW.

At the outset I shall discuss the standard of review that we employ reviewing the release order of a magistrate. Ordinarily, a magistrate's nondispositive order can be set aside only if it is "clearly erroneous or contrary to law." 28 United States Code Section 636(b)(1)(A). As the Third Circuit observed in *United States v. Delker*, 757 F.2d 1390 (3d Cir.1985), the Bail Reform Act of 1984 does not expressly provide a standard review for a magistrate's bail decision. However, after considering the legislative history, case law interpreting the former bail statute and the statute itself, Judge Adams, writing for the Court, held that the Bail Reform Act contemplates de novo determinations by the district judge. 757 F.2d at 1394 and 1395.

■ In *Delker* the Court recommended that the district court consider the decision of the magistrate in making its determinations but found no error in the district court's failure to explain why it rejected the magistrate's reasoning below. The Court stated:

"In most cases the district court will find it useful to consider carefully the decision and reasoning of a magistrate. We cannot say, however, that in the present situation, after reviewing the magistrate's opinion and holding a hearing, the district court erred by not combing the transcript of the hearing before the magistrate or in not specifically detailing which portions of the magistrate's reasons were incorrect. It is sufficient that the district court fully explained the result it reached and the reasons for it."

757 F.2d 1395. In a footnote to this statement the Court added:

"It is preferable that a transcript of the hearing before the magistrate be available for consideration by the district court in its review of the magistrate's decision, in order that the Court may, in an informed exercise of discretion, determine whether additional evidence is desirable. There may be instances, such as in the case at hand, in which the district court has held a complete evidentiary hearing of its own, and therefore a transcript of the hearing before the magistrate is not essential."

*See Delker* on that previous page cited, 1395, Footnote 3.

Therefore, it is clear that *Delker* recommends that the district court, on review of a magistrate's order, utilize the transcript of the proceedings below. *Delker* in no way binds the Court to do so; rather, the judge may conduct an evidentiary hearing and explain his findings, provided it is in compliance with all other requirements of the Act.

## VI. ADMISSIBILITY OF EVIDENCE.

### a. In General

Beyond the issue of the consideration that must be given to the magistrate's findings, I must also at the outset determine which items of evidence presented by the parties are admissible in a de novo evidentiary hearing. Section 3142(f) of the Act governing the conduct of the detention hearing provides that "the person (whose detention is sought) shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing and to present information, by proffer or otherwise. The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."

In *Delker* the Third Circuit considered the defendant's arguments that this section of the Act affords the defendant, not the Court, a choice of whether to proceed, "by proffer or otherwise." Defendant Delker argued that the Court violated the statute by requiring his counsel to proceed by the proffer of several defense witnesses' testimony. This circuit rejected both arguments relying on *United States v. Edwards*, 430 A.2d 1321 (D.C.App.1981) (en banc); cert. denied, 455 U.S. 1022 (1982) (upholding the procedural requirements of the District of Columbia detention statute upon which the Bail Reform Act of 1984 is based). The *Delker* Court found that "discretion lies with the district court to accept evidence by live testimony or proffer." *See Delker* at 1396 (citing *United States v. Payden*, 598 F.Supp. 1388, 1398, Footnote 14, (S.D.N.Y.1984). In approving the use of proffers, the Court also relied heavily on Congress' admonition that bail hearings should not become mini trials. *See Delker* citing Senate Report No. 225, 98th Congress, First Session at page 24, 1983, reprinted in the 1984 United States Code, Congressional & Administrative News at 3207; accord *United States v. Acevido-Ramos*, 755 F.2d 203, 206 (1st Cir.1985).

■ Defendants here contend only that a defendant may proceed by proffer and the government must present all evidence in full. As I stated the other day, at Mr. Taccetta's hearing, I find this is clearly not

the case. Neither the statute nor Delker put such a limitation on the use of a proffer. And I allowed both the defendants and the government to proceed in this manner.

Moreover, the *Delker* Court construed the provisions of Section 3142(f) as allowing the admission and consideration of hearsay. In so doing, the Court noted that hearsay was admissible under the Bail Reform Act of 1966. See page 1396, citations omitted.

Further, the Court looked to *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), where the Supreme Court stated that in considering the procedures required for a probable cause determination hearing following a warrantless arrest, "the full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process ... are not essential." *See Delker* at 1397 (quoting *Gerstein* 420 U.S. at pages 119 and 120, 95 S.Ct. at page 866). In *Gerstein* the Supreme Court declared that despite the fact that the probable cause determination may result in a temporary loss of liberty, it "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony and the Court has approved of these informal modes of proof." 420 U.S. at page 120, 95 S.Ct. at page 866. Relying on *Gerstein,* this circuit in *Delker* rejected the defendant's contentions that hearsay may not be admitted to demonstrate that the appellant committed the crime charged and that the district court must subpoena the out-of-court declarants whose statements linked the defendant to the crimes. See *Delker* at page 1390; *United States v. Acevedo-Ramos,* cited supra at page 207.

■ However, the freedom to admit hearsay in bail proceedings in no way negates the traditional requirement that such evidence must first be found reliable. The judicial officer is still able to make such determinations of reliability despite the speedy and informal nature of detention hearings. "The magistrate or judge possesses adequate power to reconcile the competing demands of speed and reliability by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." *See United States v. Acevedo-Ramos,* cited supra, at page 207.

Although hearsay evidence may be considered, Section 3142(f)(2)(B) still requires that "the facts that the judicial officer uses to support a finding pursuant to subsection (e), that no condition or combination of conditions will reasonably assure the safety of any other person and the community, shall be supported by *clear and convincing evidence.*" Of this clear and convincing evidence standard, Senate Report 98–225 states:

"Because of the importance of the interests of the defendant which are implicated in a pretrial detention hearing, the Committee has specifically provided that the facts on which the judicial officer bases a finding that no form of conditional release is adequate reasonably to assure the safety of any other person and the community, must be supported by clear and convincing evidence. This provision emphasizes the requirement that there be an evidentiary basis for the facts that lead the judicial officer to conclude that a pretrial detention is necessary. Thus, for example, if the criminal history of the defendant is one of the factors to be relied upon, clear evidence such as records of arrest and conviction should be presented. (The committee does not intend, however, that the pretrial detention hearing be used as a vehicle to re-examine the validity of past convictions.) Similarly, if the dangerous nature of the current offense is to be a basis of detention, then there should be evidence of the specific elements or circumstances of the offense, such as possession or use of a weapon or threats to a witness, that tend to indicate that the defendant will pose a danger to the safety of the community if released." Senate Report 98–225 at page 22, 1984 United States Code, Congressional and Administrative News at 3205.

This is one of the higher standards of proof required in judicial factfinding. It is a stricter test than the preponderance of evidence standard most commonly used in civil proceedings. *See Gertz v. Robert Welch, Incorporated,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In addition, only the preponderance of the evidence test has also been used to determine the admissibility of evidence under the Constitutional exclusionary rules. See *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

However, as stated in *United States v. Fatico,* 458 F.Supp. 388 (E.D.N.Y.1978), the Court said: "In situations where the various interests of society are pitted against restrictions on the liberty of the individual, a more demanding standard is frequently imposed, such as proof by clear, unequivocal and convincing evidence." 458 F.Supp. at 405 (quoting *In re Ballay,* 482 F.2d 648, 662 (D.C.Cir.1973)). Thus, the standard I am to apply to the evidence is quite high.

The government received court authorization to conduct electronic surveillance of the front room and rear rooms of the premises of the Hole in the Wall Luncheonette, 115 Delancey Street in Newark, New Jersey. Surveillance at this location intercepted criminal conversations in which offenses charged in the indictment were discussed. Several of the conversations obtained pursuant to this court-authorized wiretap were conditionally accepted into evidence by this Court at the defendants' detention hearings. I will now consider the legal issues raised by the use of this electronic surveillance evidence.

Defendants Michael Taccetta, Thomas Ricciardi and Michael Perna at their revocation hearings moved to exclude any evidence acquired from electronic surveillance. This position, first enunciated by the defendant Perna on October 8th, 1985 at his hearing, was reinforced by a memorandum submitted to the Court on October 11th by Mr. Taccetta's counsel. All three defendants relied on the legal arguments stated therein.

Essentially, defendants rely on two provisions of Title III, 18 United States Code Section 2510 et seq; Sections 2515 and 2518(9). Section 2515 states:

"Prohibition of use as evidence of intercepted wire or oral communications.

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding in or before any court, grand jury, department officer, agency, regulatory body, legislative committee, or other authority of the United States, a State or a political subdivision thereof, if the disclosure of that information would be in violation of this chapter."

Section 2518 states:

(9) "The contents of any wire or oral communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing or proceeding and that the party will not be prejudiced by the delay in receiving such information."

Mr. Taccetta's counsel in his oral argument supplementing his memorandum stated:

"Mr. Taccetta would have the same objection to ... any testimony derived directly or indirectly from wiretap being introduced at this hearing, for two reasons. One reason, we did not receive notice as required, your Honor, under Title III. Title III specifically requires that if any information which is derived, directly or indirectly, from wiretap is to

be used—and the statute is very specific—at a trial or any hearing, then we are to be given a copy of the application that was originally to be submitted to the judge and also be given copies of the transcripts which were prepared as a result of the wiretap. "There are very, very compelling reasons for requiring this, your Honor. Title III reflects the Congressional recognition that a wiretap constitutes very severe interference with an individual's right of privacy."

See Transcript of Oct. 10, 1985, page 13, lines 9 to 24.

Mr. Zegas also stated on behalf of Mr. Taccetta:

"... you can't take the government at its own word that information indirectly acquired was, indeed, independently acquired. That is not permissible. You have to give us the opportunity, at minimum, to review the application and order that attended the wiretap."

See transcript at page 16, lines 9 to 13.

Defendant's counsel was also permitted to submit two supplemental Memoranda of Law following the hearing.

In support of their contention, defendants rely heavily on *United States v. Farese*, 611 F.2d 67 (5th Cir.1980). In *Farese*, a bail revocation proceeding, the Fifth Circuit held that the " 'plain' language of Section 2515 ('no evidence' may be received in 'any proceeding' before 'any court') quote clearly demonstrated an intention on Congress' part to have the Act apply to 'bail revocation hearings' or any other proceeding in which evidence is being introduced affirmatively by the government." See 611 F.2d page 67 and page 71. Defendants further contend that in passing the Bail Reform provisions of the Comprehensive Crime Control Act of 1984, Congress never amended Title III to exclude bail hearings and therefore Congress "intended the prohibition on wrongfully obtained communications to continue under the new Bail Act." See Mr. Taccetta's supplemental memorandum, page 2.

The government in response contends that Congress did not intend to apply Sections 2515 and 2518 to the Bail Reform Act of 1984 pointing to the statutory mandate of expeditiousness "in order to protect the community against dangerous defendants and to prevent flight." It argues that to adopt defendant's position detention hearings would be transformed into mini trials which is impermissible under *Delker*. *See Delker*, 757 F.2d at 1395.

The government further argues that *In re Harkins*, 624 F.2d 1160, 1166, 1167 (3rd Cir.1980) and *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), reflect a recognition in the context of Grand Jury witnesses of "an accommodation between the due functioning of the Grand Jury system and the federal wiretap statute." 408 U.S. at page 70, 92 S.Ct. at 2372. (White, J., concurring). See also Harkins at page 1167. Moreover, the government contends that the defendants, even if correct, have waived their purported rights under 18 U.S.Code Sections 2515 and 2518 since they made no objection to the use of such evidence before Magistrate Haneke and because Mr. Taccetta's counsel even "affirmatively used these disclosures in the defense proffer." See government's memorandum page 11.

In a supplemental brief dated October 16, 1985, the government finally relies on the case of *United States v. Angiulo*, 755 F.2d 969 (1st Cir.1985) for the proposition that wiretap evidence can be used at a bail hearing before its legality is tested. Although this Court was previously aware of the *Angiulo* case prior to the government's submission, defendant Taccetta was given an opportunity to submit an additional letter brief commenting on the case.

The problem presented here is troublesome. There can be no doubt that Congress was deeply concerned with the privacy rights of defendants in enacting Title III. *See Gelbard* cited supra, 408 U.S. at page 48, 92 S.Ct. at page 2361. The First Circuit in *In re Globe Newspaper Company*, 729 F.2d 47 (1st Cir.1984), a case related to *Angiulo*, recently stated: "The extensive disclosure restrictions of Title III reflects Congress' recognition that when

communications are unlawfully intercepted the invasion of privacy is not over when the interception occurs, but is compounded by disclosure." Judge Coffin, speaking for the panel, quoted a First Circuit case, *Providence Journal Company v. FBI*, 602 F.2d 1010, 1013 (1st Cir.1979). *See* 729 F.2d at 54.

In addition to these vital concerns, I must look to the mandates of the Bail Reform Act. Section 3142(f)(2)(B), *inter alia*, requires a detention hearing to "be held immediately upon the person's first appearance before the judicial officer unless that person or the attorney for the government seeks a continuance." Section 3145 dealing with review and appeal of a release or detention order requires that such motion "be determined promptly."

In stressing the need for de novo review the Delker court, relying on *United States v. Edwards*, said:

> The Bail Reform Act permits detention of the defendant pending completion of a hearing, BRA Section 3142(f), and thus the judicial officer is commanded to render a prompt decision. It may not always be possible to procure a transcript quickly. We note that under the statute a defendant may request a continuance of five days if he or she wishes the time. BRA Section 3142(f). Thus, while we are reluctant to impose a time-consuming requirement on a proceeding that must by its nature be speedy, we believe that the presence of a transcript is important and that a defendant, if he or she considers it advisable, may employ a continuance to ensure that the magistrate's transcript is available.

> \* \* \* \* \* \*

"Congress warned that bail hearings should not become mini trials.

*See Delker* page 1395, Footnote 3 at page 1396.

Tension obviously exists between the two statutes. In *Globe* and a case which I described was directly related to it, *United States v. Angiulo*, cited supra, the First Circuit attempted to deal with this delicate problem.

*Globe* addressed itself to the familiar controversy of Fair Trial versus Free Press. In *Globe* the Court noted that the magistrate had closed its bail hearing to the public because of the introduction of wiretap evidence under the Bail Reform Act of 1966. There the magistrate, pursuant to Section 2518(9) had entered an ex parte order waiving the ten-day document inspection period. The circuit court upheld the Magistrate and the District Judge below in barring the press after balancing First Amendment rights against Sixth Amendment considerations.

Subsequently, in *Angiulo*, the defendant in the above matter sought release from pretrial detention. The District Judge, applying the Bail Reform Act of 1984, denied the application. The Court of Appeals affirmed, holding inter alia that the new Act's provisions were applicable. Significantly, Judge Breyer, speaking for the Court, said:

> "Appellant argues that, even if the new Act applies, the government has not proved by the 'clear and convincing evidence' that the Act requires that he poses a danger to 'the safety of any other person in the community.' 18 U.S.C. Section 3142(f). He first claims that the district court could not rely on the evidence obtained by electronic surveillance, the legality of which he challenges. We previously wrote, how much, in *In re Globe Newspaper*, 729 F.2d 47, 54 (1st Cir.1984), a case in which both the defendant and the government were parties, that the provisions of federal law 'allowed disclosure of (information obtained through electronic surveillance) to the court conducting ... bail hearings,' at least until a court has decided that the material was not obtained legally. Otherwise, the challenge of a defendant to lawfully obtain materials might prove sufficient to keep highly relevant information from the judicial officer or to delay the initial bail hearing, contrary to the 'immediacy' requirement of Section 3142(f)."

Reading *Angiulo* closely, it seems that the Court chose not to rely on the ex parte waiver but on the necessity for a prompt limited hearing at the bail stage of the case.

I cannot distinguish *Farese* except to say that it dealt with the 1966 Act while this court must be concerned with this new statute. Obviously, some common sensible accommodation must be made where a vital right of privacy is to be considered, even in light of the intention of Congress to provide for pretrial detention on broader grounds than previously existed. *Farese,* however, does not properly address these competing interests.

*Delker,* as previously noted, recognizes the statutory necessity of promptness and immediacy. It instructs the Court to prevent detention hearings or revocation hearings from becoming a "full blown trial contrary to the aforementioned requirements of Section 3142(f)." Although these hearings are to be held promptly, it must be recognized that these hearings can result, as *Delker* points out, in restricting "for a significant time the liberties of presumably innocent persons." 757 F.2d at 1398.

■ Even considering such possible restrictions on liberty, I find *Angiulo* more persuasive than *Farese* in light of the new Act and its provisions. I also find that *Delker,* while not directly on point, is philosophically more in tune with the First Circuit's approach than the Fifth Circuit's and provides relevant precedential guidance. I find that in this context Congress did not intend nor is it constitutionally required that Sections 2515 and 2518(9) be followed in a Section 3142 pretrial detention or release hearing.

■ Perhaps the fair and just solution in certain circumstances is for a judicial officer, confronted with electronic surveillance evidence at a bail hearing, to follow the reasoning of *Globe* and seal the evidence in order to preserve the defendant's right to a fair trial. While sealing all electronic surveillance until its legality is determined is one option to consider at a bail hearing, I do not find that such a procedure would be required under Third Circuit law. In *United States v. Martin,* 746 F.2d 964 (3d Cir. 1984), Judge Higginbotham, in reversing the districts court's order sealing tape recordings admitted into evidence at trial stressed that the district judge was in error when he concluded that there was a "no reasonable alternative to this course of action." The Third Circuit concluded that the District Court had given too little weight to the impact of skillfully conducted voir dire examination as an antidote to the effects of publicity. See page 970, citing to *United States v. Criden,* 648 F.2d 814, 828 (3d Cir.1981). While the Third Circuit has not yet addressed the exact issue raised here, I believe their reasoning would be similar.

■ Here, on the record before me, however, the defendants only asked that the record be sealed as to certain matters. Assuming, arguendo, that defendants are correct in their contention that Title III's provisions are applicable, I find that they clearly waived their rights in this regard.

As the government correctly points out, it used some electronic surveillance evidence at the hearings before Magistrate Haneke without any objection from the defendants. In fact, as noted previously, Mr. Taccetta's counsel used these disclosures affirmatively. The government did state its intention to continue to utilize electronic surveillance material in its initial brief in support of detention which defendants received in mid-September at least three weeks prior to these hearings. And the government's amended briefs rang similar bells.

In the face of this, all three defendants waited until the eve of these hearings before me to raise this issue. Admittedly, the second time around the government utilized a greater amount of such material, but this was clearly predictable and foreseeable. Contrary to defendants' assertions, the notice provisions of subsection 9 of 28 U.S.C. Section 2518 were not rendered meaningless with such advance notice.

Defendants' trial counsel are all highly experienced in matters of this kind. As Mr. Ricciardi's counsel stated at the hearing on October 9th, 1985, "... I'm frank to say at the time of the magistrate's hearing we did not perceive this issue. It might have escaped us, that's all." See transcript of the Ricciardi proceeding, page 6. To the extent the issue is even viable, the waiver of this issue could not be much clearer.

The government provided defendants with the orders, applications and affidavits supporting electronic surveillance on Tuesday, October 15, 1985, three days ago. Should defendants challenge this surveillance under Title III and any and all of the evidence relied on be suppressed at a later date, nothing prevents the defendants from bringing a motion for release based on this fact at a later date, should they be detained.

### 6. Evidence Presented for *In Camera* Consideration.

Additionally, at the detention hearings for defendants Accetturo and Taccetta, the government presented two tapes of an oral communication obtained pursuant to court-authorized electronic surveillance, a transcript of the tapes and the affidavits of Special Agents of the FBI. In their affidavits the agents state that they are personally familiar with the voices of the three and they certify that the voices on the tape are correctly identified. The government offered this evidence to show (1) that Martin Taccetta and Robert Caravaggio have threatened a potential government witness, Michael Esposito, as well as Esposito's family, and that they will continue to do so; and, (2) that defendants Accetturo and Michael Taccetta control Martin Taccetta's and Robert Caravaggio's actions in this regard. In seeking *in camera* consideration of the evidence, the government argues that disclosure of the transcript and tape would identify three speakers not currently known by the defendants to have knowledge of an alleged extortion involving Michael Esposito and would thus subject these individuals to threats and/or physical violence.

Little authority exists to guide this Court in determining whether to consider evidence in camera. In *United States v. Stanford,* 551 F.Supp. 209, 211, (D.C.Md. 1982), the district court held that the magistrate below did not err in considering in camera a sealed affidavit to determine if bail should be reinstated or the defendant should be detained. The *Stanford* court held that

> a defendant is provided with a summary of a sealed affidavit, the reliability of which is determined as a preliminary matter, and where the summary is found to be accurate and complete in terms of the type of detail necessary to put the defendant on notice as to the nature of the allegations against him, due process is not violated as long as the defendant has the opportunity to refute the allegations.

*Id.* In *United States v. Acevedo-Ramos,* 755 F.2d at 208–09, the First Circuit approved of the Stanford procedure for inspecting evidence ex parte in camera in certain limited circumstances:

> "[I]n an unusual case, where the government provides strong special reasons for keeping its evidentiary sources confidential, e.g., protecting witness safety, the magistrate or judge, upon defendant's request, can still test the veracity of the government's testimony and the quality of the underlying evidence by, for example, listening to tapes or reading documents in camera.

> \* \* \* \* \* \*

> "Such examination offers a practical way to reconcile the ... need for witness protection with defendant's reasonable interest in securing an independent judicial check on the quality of the evidence the government advances as a ground for his detention. We do not here mean to suggest an in camera presentation of evidence is often desirable or often permissible except in a very unusual case. Rather, we mean simply that in the very

unusual case in which strong special reasons warrant confidentiality and where the defendant is apprised of the gist of the evidence through government testimony at the hearing, the magistrate's independent, though in-camera, review of the underlying evidence at the defendant's request offers the defendant greater protection than no independent check at all."

*Id.* (Citations omitted).

*United States v. Wind,* 527 F.2d 672 (6th Cir.1975), however, seems to present conflicting authority. There the Sixth Circuit vacated the district court's order to detain the defendant because the order relied to some degree on *in camera* testimony presented by the government showing that Wind would flee if released and would pose a danger to witnesses in the community. *Id.* at 676. Although the transcript of the magistrate's hearing contained substantial evidence that Wind posed a danger, the court held that reliance to any extent on the in camera testimony was error. *Id.* at 675, 676. The *Stanford* court distinguishes *Wind,* however, by noting that there the defendant was completely excluded from an evidentiary hearing before the district court. *Stanford,* 551 F.Supp. at 211. In *Stanford,* the defendant was present at the evidentiary hearing and excluded from seeing only one sealed affidavit. I find this distinction tenable in determining that the *Acevedo-Ramos/Stanford* rule should govern my *ex parte in camera* consideration of a taped consideration and a transcript in this case.

■ I find the government has satisfied the requirements of *Acevedo-Ramos* and *Stanford.* The government has provided the "strong special reasons" requiring the confidentiality of this information. In essence, disclosure of the identities of the speakers of the tape would subject them to potential harm and interference as witnesses. Moreover, in its amended brief, the government provides an extensive summary of the contents of the recording and transcript. This summary provides the defendants with the details necessary to re-

fute the allegations contained therein. Finally, I have determined for the reasons stated by the government in its brief—namely, that the conversants are accountable to others for the truth of their taped statements—that the information contained in the tapes is reliable. I therefore find that the two tapes and the transcript may be considered in camera by this Court in deciding whether to detain defendants Accetturo and Taccetta.

■ Defendant Taccetta raises the argument that the government's right to seek revocation of the magistrate's order has been waived by the untimeliness of their motion. This argument I find is of no merit and need not detain us long. Although 18 U.S.C. Section 3145 states that a revocation motion "shall be determined promptly," the statute provides no further guidelines as to what promptness is required in circumstances such as those present here. I find that promptness emphasizes the need to consider both the interests of an already incarcerated defendant and the interests of society in allowing an allegedly dangerous individual to roam free due to a congested court calendar. This phrase, however, set no time limit for the government's filing of its revocation motion. Certainly, the swiftness of the government in seeking to detain an allegedly dangerous defendant may be an intangible factor in the Court's impression of whether the defendant is really dangerous, but the final balance required under the Act must turn on weightier concerns than how swiftly government personnel were able to draft a brief and motion papers. The government's motions were not untimely.

## VII. SPEEDY TRIAL CONCERNS.

Defendants have contended that the length of pretrial detention is a factor which must be considered if the Bail Reform Act is to pass constitutional muster. In a complex case such as this, there is no doubt that defendants' trial will not commence for many months. At present, a trial date has been set, for April 16th, 1986.

In addition, the trial, itself, is expected to last at least 3 months.

Based on my present scheduling order and the estimated length of trial, the reality of detention here will mean incarceration of presumptively innocent individuals for approximately ten months. Because of this reality, I note at the outset with respect to my original scheduling order that the defendants on the record reserved their right to change their original position regarding excludability factors under the Act should any one of the defendants be detained and wish to go to trial sooner.

Defendants' first argument rests on the case of *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 1 (1951), which defendants cite for the proposition that "[t]he length of incarceration prior to trial is of significance to any detention decision because detainment inevitably interferes with the presumption of innocence of a defendant, with the right of a defendant not to be punished unless convicted, and with the right of defendant to the unhampered preparation of a defense." While I agree that such considerations are of paramount importance in my determination on this issue, I do not find that *Stack v. Boyle* prohibits pretrial detention in proper circumstances even if it is an extremely lengthy incarceration. *Stack* addressed the much narrower issue of what constituted excessive bail under a federal law which explicitly provided that *some* bail *must* be set for a person arrested for a noncapital offense. As previously stated, the Bail Reform Act is a major departure from prior bail laws, and the presumption that some conditions of release can be fashioned for every defendant is no longer present.

The issue raised by a defendant's concern over the potential length of any detention here more accurately goes to the heart of the balance struck in the new Act between a defendant's liberty interests and the societal interests incorporated into the new Act previously addressed. The length of the detention enters into this balance as a result of the fact of detention. In essence, a lengthy detention simply lends more gravity to the detention itself at a time when a defendant is constitutionally presumed to be innocent. Therefore, before considering whether the length of detention should be a factor, I must first consider the constitutionality of any detention at all. Although the new Bail Act has specifically been up upheld as constitutional, see, for example, *United States v. Hazzard*, 598 F.Supp. 1442 (N.D.Ill.1984), *United States v. Payden*, 609 F.Supp. 1273 (S.D.N.Y.1985), these cases did not review the law in light of the specific length of detention arguments made here.

In addressing the abridgement of this liberty interest, the case law concludes that pretrial detention *is* constitutional in *some* circumstances. In *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), the Supreme Court stated:

"The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause had never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept. The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country. Thus, in criminal cases bail is not compulsory where punishment may be death. *Indeed, the very language of the amendment fails to say all arrests must be bailable.* We think, clearly, here that the Eighth Amendment does not require that bail be allowed under the circumstances of these cases."

*Id.* at 545–46, 72 S.Ct. at 536–37 (footnotes omitted; emphasis supplied).

Detention during trial has been held to be constitutional upon proof that the defendant was involved in the obstruction of justice. See *United States v. Leon*, 766 F.2d 77, page 81, (2nd Cir.1985), citing the *United States v. Bentvena*, 288 F.2d 442, 444, 445 (2d Cir.1961), *Carbo v. United States*, 288 F.2d 686, 689 (9th Cir.1961),

review denied, 369 U.S. 868, 82 S.Ct. 1137, 8 L.Ed.2d 274 (1962). Where risk of flight is unusually great, it is also constitutional to detain a defendant prior to trial. See *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir.1985) (citing *United States v. Abrahams*, 575 F.2d 3 (1st Cir.), cert. denied, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); *United States v. Melville*, 306 F.Supp. 124, 127 (S.D.N.Y.1969); *United States v. Graewe*, 689 F.2d 54 (6th Cir.1982); *United States v. Gilbert*, 425 F.2d 490, 491, 492 (D.C.Cir.1969)). These cases did not specifically limit their holdings to situations where the detention would be short. The implicit assumption was that if conditions warranted detention, the defendant would be detained until the end of trial, and the length of that detention was not discussed. Thus, I find that it is well settled that the bail clause of the Eighth Amendment does not prevent lengthy pretrial detention under certain limited circumstances and I turn to weightier concerns raised by the due process clause of the Fifth Amendment.

 Chief Judge Weinstein in the *Columbo* case, cited supra, has found that the due process clause requires a consideration of the length of pretrial incarceration as a factor in addition to the four factors Congress spelled out in 18 U.S.C. Section 3142(f). In *Columbo*, the court ordered the defendants released until trial, after they had already spent more than 90 days in prison. In reaching its decision, the court noted:

> "No one would argue that these accused of criminal conduct should be treated more leniently because they engage in complex crimes and extensive patterns of criminality involving many associates. Nevertheless, the Court must, it is submitted, consider the time the defendant will probably be incarcerated in determining whether he should be detained before trial ... The largest discretion must be afforded the Magistrate and the District Judge to consider all relevant factors, including the period of possible incarceration."

*Columbo*, at 787.

I respectfully disagree with Chief Judge Weinstein. While I agree that the probable length of incarceration is an important factor in a bail decision, the extensive procedural safeguards contained in the Act and the legislative history of the Act unequivocally demonstrate that this factor is already incorporated in the Act, and Congress did not intend nor is it constitutionally necessary for the Court to rewrite the statute to add this factor. As the Third Circuit noted in *Delker*, "Pretrial detention implicates a liberty interest and thus may not be imposed contrary to the mandates of procedural due process. *E.g., Morrissey v. Brewer*, 408 U.S. 471 [92 S.Ct. 2593, 33 L.Ed.2d 484] (1982) ... But due process is flexible and calls for such procedural protection as the particular situation demands." *Delker*, 757 F.2d at 1396.

I find that Congress made a determination in the Bail Reform Act as to what procedural protection a deprivation of liberty in the bail context demands and that the balance they have struck withstands constitutional analysis. In dicta the Court in *Delker* implicitly also recognized that there may be lengthy pretrial detention. The Court stated, "A pretrial detention hearing may restrict for a significant time the liberty of a presumably innocent person." 757 F.2d at 1398.

Before detailing some of the factors Congress considered in striking the balance, I note at the outset that the solemn enactments of the legislative branch enjoy a strong presumption of validity. See *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983). This is especially so where, as here, Congress specifically considered the question of the Act's constitutionality. *See Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). The Senate Report accompanying the Act stated:

> "The committee recognizes a pretrial detention statute may nonetheless be

constitutionally defective if it fails to provide adequate procedural safeguards or if it does not limit pretrial detention to cases in which it is necessary to serve the societal interests it is designed to protect. The pretrial detention provisions of this section have been carefully drafted with these concerns in mind." Senate Report No. 98–225, page 8, 1984 United States Code Congressional & Administrative News at 3191.

Not only did Congress consider the Act's constitutionality, but it also considered the liberty interest of a defendant which permeates all aspects of the Act. The liberty interest implicated by pretrial detention is the weight that counterbalances all other factors taken into consideration in a bail determination. Considerations of community safety under 18 U.S.C. Section 3142(e) may be taken into account only if done so openly and candidly with the right of the defendant to address the specific allegations made in this regard. This is in stark contrast to the prior bail law under which many courts felt compelled to consider the danger a defendant posed to the community but couched their concerns under the "risk of flight" standard so that defendants had no opportunity to confront the evidence on this issue. As the Justice Department testified at hearings in which the old bail law was criticized:

"Current law places our judges in a desperate dilemma when faced with a clearly dangerous defendant seeking release. On the one hand, the courts may abide by the letter of the law and order the defendant released subject only to conditions that will assure his position at trial. On the other hand, the courts may strain the law and impose a high money bond, obstensively for the purpose of assuring appearance, but actually to protect the public. Clearly, neither alternative is satisfactory. The first leads the community open to continued victimization. The second, while it may assure community safety, casts doubt on the fairness of release practices."

*See* testimony of Deputy Attorney General Jeffrey Harris cited at page 10 of Senate Report 98–225, 1984 United States Code, Congressional & Administrative News at 3193.

This right to confrontation and more extensive hearings in the face of a strong societal interest in detaining dangerous defendants would not be necessary but for the extent of the period within which a defendant could be detained pursuant to Section 3164 and whether the Speedy Trial Act exclusions should be applicable to cases involving defendants detained pending trial had been the subject of extensive consideration by Congress. See Senate Report No. 212, 96th Congress, first session 1979, H.R. No. 390, 96th Congress first session (1979), 1979 United States Code, Congressional & Administrative News at 805. Speedy Trial Act Amendments of 1979, hearings before the Senate Committee on the Judiciary, 96th; first session (May 2nd and 10th 1979).

During its consideration of this issue, Congress also approved another factor which could be considered as excludable time: "whether the case is so unusual or complex, due to the number of defendants, the nature of the prosecution or the existence of novel questions of factor law that it is unreasonable to expect adequate preparation for pretrial proceedings" with respect to the defendants' liberty interest. *See* S.Rep. No. 212, 96th Cong., 1st Sess. (1979) at 2, 41. The detention hearing, while not a mini-trial, provides the defendant with a panoply of procedural. protections required almost in no other situation than an actual trial (*e.g.*, the right to testify, the right to present witnesses and the other evidence on his behalf and the right to cross-examine witnesses for the government). Again, such procedural protections are only required where significant liberty or property interest is implicated. See *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975).

Moreover, the facts on which any finding of dangerousness is based must, under Section 3142(f), be supported by clear and con-

vincing evidence. Such a high standard would not be necessary but for the defendant's countervailing liberty interest.

Although the pretrial detention provisions of the Act were designed to detain only a small but identifiable group of defendants, Congress has still intended that individualized attention be given to each defendant. As stated in the Senate Report: "The committee intends that the judicial officer weigh each of the discretionary conditions separately with reference to the characteristics and circumstances of the defendant before him and to the offense charged, and with specific reference to the factors set forth in subsection (g)." S.Rep. No. 98–225 at 14, 1984 United States Code, Congressional & Administrative News at 3197.

Lastly, where the defendant is detained pending the detention hearing, any continuance of the hearing must be brief. "[T]he period of a continuance suit by the defendant and one sought by the government is confined to five and three days, respectively, in light of the fact the defendant will be detained during such a continuance." Senate Report 98–225, page 22, 1984 United States Code, Congressional & Administrative News at 3205.

Because the liberty interests are so intricately interwoven into the Act and are the very reason why the Act is so detailed and so carefully drafted, Chief Judge Weinstein's criticism of Congress' drafting in this regard goes to the heart of the Act and is, in essence, a disagreement with the fact of the Act being passed at all. While Chief Judge Weinstein certainly does not stand alone in his criticism of pretrial preventive detention, the fact remains that Congress did decide to enact the statute after years of study and a careful balancing of competing interests. Thus, unless a Court finds the Act to be unconstitutional, it is obliged to apply it.

 Defendants in the instant case and Chief Judge Weinstein in the *Columbo* decision find there is a conflict between the excludable delay provisions of the Speedy Trial Act, 18 United States Code Section 3161(h), and the detention provisions of the Bail Reform Act. Chief Judge Weinstein noted that: "Congress will undoubtedly need to make some technical corrections in the Comprehensive Crime Control Act of 1984. Perhaps it may also wish at the same time to reconsider the relation between pretrial detention and the Speedy Trial Act in complex cases." See *Columbo*, at 787.

There is no need to consider such a relation due to the new Bail Reform Act. Congress has already addressed the application of the Speedy Trial Act's excludable delay provisions to defendants under detention orders in complex cases. The final plan for the prompt disposition of criminal cases in this district, approved June 26, 1980, is not contrary to either of these Acts.

In 1979, Congress determined that the exemptions for excludable time in the Speedy Trial Act should also apply to defendants detained prior to trial. See 18 U.S.C. Section 3164. In fact, Senate Report No. 212, 96th Congress, First Session (1979) at page 2 at page 41. See also 18 U.S.C. Section 3161(h)(8). Thus, the lengthy detention of a defendant under the Bail Reform Act due to a complex case is also specifically contemplated by the Speedy Trial Act. In the four years that this provision of the Speedy Trial Act has been in effect, I have found no case holding such a result to be a violation of either the Eighth Amendment or the due process clause.

It may be due to this background that Congress assumed that there was no need to craft a time frame on the Bail Reform Act limiting the length of detention. While Congress substantially incorporated the pretrial detention provision of the District of Columbia Code into the new Act, they did not adopt the D.C.Code's 60-day limitation on the detention period. As stated in the Senate Report to the Act: "18 U.S.C. 3161 specifically requires that priority be given to a case in which a defendant is detained and also requires that his trial must, in any event, occur within 90 days, subject to certain periods of excludable delay, such as for mental competency tests.

These current limitations are sufficient to assure that a person is not detained pending trial for an extended period of time." *See* Senate Report 98–225, page 22 note 63. 1984 United States Code, Congressional & Administrative News at 3205. I thus find that the length of the detention possible here was not unforeseen by Congress in either the Speedy Trial Act or the Bail Reform Act.

## VIII. FINDINGS OF FACT.

The indictment alleges *inter alia* the conduct of an enterprise through a pattern of racketeering activities and conspiracy to do the same. These charges, by their very nature, involve related acts by various individuals. Consequently, the evidence presented to this Court, frequently overlaps as to two or more of the defendants of whom the government today seeks detention. Therefore, in order to clearly and coherently discuss the evidence considered by this Court in determining whether any condition or combination of conditions will reasonably assure the appearance of the defendants and safety of any other person of the community, I will first discuss that evidence which overlaps as to multiple defendants. I will then indicate my findings as to the credibility and reliability of that part of the evidence. Next, I will discuss each individual defendant seriatim considering first the application of the rebuttable presumption of Section 3142(e) where relevant. Then I will evaluate for each individual defendant the foregoing evidence as well as evidence pertaining to that individual defendant against the factors listed in Section 3142(g) of the Act. Based on this evaluation, I will determine as to each individual defendant whether there are conditions of release that will reasonably assure the appearance of each defendant and the safety of any other person of the community.

At the detention hearings of defendants Accetturo, Taccetta, Perna and Ricciardi, the government proceeded by proffer and by direct testimony of FBI Special Agent Dennis J. Marchalonis. In addition, the government introduced transcripts of a conversation obtained pursuant to court-authorized surveillance as previously discussed, two tapes and a transcript for *in camera* consideration as discussed, and various documents including, inter alia, a list of prior convictions, photographs, police reports, a certification of a potential government witness and transcripts of sentencing proceedings. The defendants proceeded by proffer and also submitted documents, which included a deposition of Mr. Aron from defendant Accetturo which has been marked in evidence. The defendants cross-examined the government's witness but did not present any witnesses of their own. The transcript of the proceedings below before Magistrates Kyle and Haneke were also submitted to this Court.

Special Agent Marchalonis first testified as to the origins of the alleged Taccetta Group Enterprise. A government witness testifying under oath informed Marchalonis that defendant Accetturo took over the numbers operation of one "Ham" Dolasco following Mr. Dolasco's death in the early 1960s and expanded that organization to include Michael and Martin Taccetta as well as other co-defendants in this case. (See Transcript of hearing on Anthony Accetture at page 7, hereinafter referred to as "A. Tr.") After being subpoenaed by the New Jersey State Commission of Investigation in the late '60s or early '70s, Mr. Accetturo fled from New Jersey to Florida. Following his move, Michael Taccetta likewise moved to Florida to receive two or three years of training to assume a leadership role in the organization in New Jersey. Michael Taccetta returned to New Jersey in the mid-1970s to organize his own "crew," but remained in regular contact with defendant Accetturo to obtain preauthorization for any criminal activity undertaken by the New Jersey group.

Based on information from witnesses, confidential sources and electronic surveillance, Agent Marchalonis also testified regarding the hierarchical nature of the alleged Taccetta organization. In Marchalonis' opinion, defendant Accetturo is the boss of the organization who gives prior

authorization to any criminal activity and who was advised of and served as final referee regarding any long-term decisions involving the organization. See Taccetta transcript at pages 36 to 39, hereinafter designated as "T. Tr." Defendant Michael Taccetta serves as a "underboss," or acting boss who makes day-to-day decisions regarding criminal activities in New Jersey. T. Tr. at pages 36 to 40. Michael Taccetta's approval is required for any proposal designed to generate funds for the organization. T. Tr. at page 40. Michael Taccetta, Martin Taccetta, Michael Perna and Thomas Ricciardi form the inner circle, but the key individual in the hierarchy is Anthony Accetturo. T. Tr., page 43.

Agent Marchalonis also testified as to corroborated information provided to him in September by a previously reliable witness. The witness told Marchalonis that four or five of the co-defendants in this case have stated that they report to Michael Taccetta, who in turn answers to Anthony Accetturo. T. Tr. at page 8.

In response to this testimony defendant Michael Taccetta has proffered evidence that the government witness who was the source of this evidence, Joseph Alonzo, is unreliable. In support of this contention the defendant proffered that Mr. Alonzo has used various aliases, has a lengthy criminal history including arrests for assault, breaking and entering, weapons possession, motor vehicle and narcotics offenses and suffers from the effects of alcohol and narcotics addiction and has received psychiatric treatment. In response, the government has submitted that Mr. Alonzo supplied this information to the Grand Jury investigating this case under oath, that he is a source only for the information regarding Michael Taccetta's rise to the position of underboss in this alleged organization and some other items of evidence to be discussed later in this opinion and that in any case he is merely a source but not the sole source of this information.

The record indicates that over the years the defendant Michael Taccetta has not always kept the most upstanding company.

Criminal proceedings are commonly permeated with testimony from individuals with criminal backgrounds, which defendants highlight at trial. Sometimes such testimony bears high indicia of unreliability. Law enforcement dependence on these individuals is often misplaced. But often individuals with unsavory backgrounds who become government informants provide highly reliable testimony. Government reliance on this kind of evidence often reflects a correct judgment that it takes the testimony of an insider to accurately unfold the details of criminal activities of an insulated group of individuals.

Defendant Taccetta's proffer is entitled to respectful attention but should be weighed along with other evidence to determine whether the government has met its burden in proving the need to detain. After carefully considering the defendants' proffer, I am not induced to arbitrarily dismiss this witness as unreliable in all respects, especially in regard to Michael Taccetta's role in the alleged organization. There exists other reliable evidence to support this contention. I find Agent Marchalonis to be a credible witness in relating what he has been told by Mr. Alonzo as well as by other witnesses.

Agent Marchalonis also testified as to information received from a confidential source the day of Michael Perna's detention hearing. Marchalonis testified that the source told him that in the late 1970s and early 1980s defendants Perna and Taccetta converted independent bookmakers into workers for the alleged Taccetta organization through use of violence. See Perna transcript at page 36 (hereinafter "P. Tr."). This violence included entering the bookmaker's home under pretense and then beating or generally terrorizing the bookmaker and forcing him to work for the defendants. The confidential informant told Marchalonis that he personally observed such incidents and also witnessed the beating of a sports bookie in the Down Neck section of Newark by defendants Perna and Michael Taccetta. In evaluating the defendants' danger to the community or

others, it is striking that there is ample evidence of organizational loansharking, a vocation which is normally attended by threats and violence.

In order to evaluate the reliability of this information, I have read the transcripts of the tapes which amply demonstrate that loansharking was a daily activity of this organization. As Agent Marchalonis testified, the Hole in the Wall Luncheonette operated as a bank. *See* P. Tr. page 19. Debtors borrowed money at highly exhorbitant rates and the organization, as the evidence and proffer show, made sure these debts were collected.

More specifically, Marchalonis testified that after decoding a book purportedly recording loansharking transactions, which was seized during a search executed approximately two years ago, agents interviewed some of the debtors whom they were able to identify. Some of the debtors told Marchalonis that they had nothing to say or that they were afraid. When confronted with evidence that they had been overheard in court-authorized wiretaps in connection with loansharking debts, they admitted that they had frequented the Hole in the Wall Luncheonette, knew Michael Perna or Michael Taccetta and had borrowed money but that the loans were "friendly" ones. I believe, after carefully considering all the evidence, that fear of violent retribution has caused this remarkable unanimity of silence in this regard.

Agent Marchalonis also testified that physical surveillance during the course of the investigation indicated that defendant Accetturo had met various codefendants in New York. Information from court-authorized electronic surveillance also indicated that certain codefendants, including Thomas Ricciardi, traveled to Florida and were seen with Anthony Accetturo. These conversations were generally with defendant Michael Perna and indicated that Accetturo was being advised of activities in New Jersey. A. Tr. at pages 45 to 50. I believe this testimony and I find it demonstrates that a close-knit, hierarchical structure exists with Anthony Accetturo at its apex.

The government also introduced into evidence several transcripts of tape recorded conversation obtained pursuant to court-authorized electronic surveillance as discussed supra. One conversation which occurred December 8th, 1982, involved a numbers and horse betting operative named Rocky Budd. See P. Tr. pages 28 to 31. The conversants were defendants Michael Perna, Thomas Ricciardi and another codefendant not the subject of these detention hearings, Alphonse Cataldo. The conversants indicated that they felt Rocky Budd was not properly sharing the proceeds of his business with their alleged organization. Cataldo indicates that he "grabbed" Rocky Budd and spoke to him. When Cataldo stated that Budd was "scared," defendant Perna stated, "He's supposed to be scared." Later in the conversation, defendant Ricciardi refers to Budd as follows: "Sometimes we worry, too [expletive deleted] much. I tell you what. A guy like him we should [expletive deleted] put in blackness. That's what he deserves. This way he—you're never gonna make that mistake again, ya know what I mean? And anybody else that was around and heard the story will know why ..." Agent Marchalonis testified that to be "put in blackness," means to be killed. I accept this interpretation. *See* P. Tr. at page 30. The ominous state of this conversation speaks for itself.

Another transcript of a tape recorded conversation occurring on March 11, 1983 was introduced. Defendants Perna and Ricciardi were overheard discussing a video gambling machine which Ricciardi or an associate had placed in an establishment. *See* P. Tr., pages 31 to 34. The owner of the establishment contacted Ricciardi and told him he wanted the machinery moved. The owner stated he was "with somebody," Agent Marchalonis testified, based on his investigative experience, that to be "with somebody," means that the individual is associated with someone or a group that provides him with protection to whom he could turn with any problems. In the conversation Ricciardi indicated to Perna that

he was checking to learn whether the owner was, in fact, "with someone." Ricciardi concluded that " 'Cause if he ain't, where he said, "it ain't being moved!" referring to the video gambling machine. Perna responded, "Exactly, exactly." I accept Agent Marchalonis' interpretation of this exercise in free enterprise.

Agent Marchalonis also testified without reference to a transcript regarding another conversation which occurred in March of 1983. *See* P. Tr. at pages 19 to 21. Michael Perna related to an associate named Frank that he received a phone call at his home at approximately 2:30 a.m. The caller, a "numbers" winner, demanded payment of $1100. Marchalonis testified that Perna related that the caller urged him to contact "Tumac" and to tell Tumac that he wanted the payment. Perna concluded his conversation with Frank saying that Perna paid the individual because his boss told him to.

Marchalonis explained the meaning of the name "Tumac" by way of testimony regarding another conversation he had listened to during the investigation. In that conversation Marchalonis testified defendant Perna ordered flowers to be sent to a deceased associate. He directed the florist to send the flowers from "Anthony and Jerry" followed by the name "Tumac" in parentheses. Perna also ordered another floral basket for defendants Taccetta Ricciardi, himself and Martin Taccetta. Marchalonis testified based on this conversation that "Tumac" was used to refer to Anthony Accetturo and that "Jerry" referred to Mr. Accetturo's wife, who was named Geraldine. I accept this interpretation.

Marchalonis also testified as to one other conversation relating to the involvement of Michael Taccetta with Anthony Accetturo. One court-authorized tape containing a telephone conversation between defendant Perna and defendant Accetturo. In that conversation Accetturo was looking for defendant Taccetta at the Hole in the Wall Luncheonette. See A. Tr. at pages 42 and 43.

Agent Marchalonis also testified as to information provided him by Joseph Alonzo regarding other criminal activities allegedly undertaken by the defendants in 1983. As for Alonzo's reliability, which, as previously stated, has been strongly attacked by all defendants, his role in what has been called the Aron and Aron matter becomes a fairly significant indication of his relationship to the defendants. Agent Marchalonis testified that in 1983 Mr. Accetturo, Michael Taccetta and Thomas Ricciardi, turned their attention to a jewelry business named Aron & Aron, which was then located in Fort Lauderdale, Florida. The agent related that he had been informed by a witness, presumably Alonzo, that a rival organized crime group had attempted to "push into this company." One of the individuals involved in the company sought assistance from Michael Taccetta and asked him to intercede. Taccetta allegedly agreed and a meeting was held in the Diplomat Hotel in Florida.

The witness stated defendant Accetturo was present with Michael Taccetta, Thomas Ricciardi, Frank Suppa, the witness and others. As a result, it was decided that Suppa would intercede and would take care of the problem and in return, Accetturo and his associates would control 25 percent of the business. The witness told Marchalonis that one of the principals was forced out and actually physically assaulted by Suppa in order to encourage him to leave.

Marchalonis also testified that in connection with the takeover, in order to save Aron & Aron from the grip of this rival organization, a meeting was held with a rival organized crime individual by the name of Corky Vastola. Vastola was told that he should get lost and that the Accetturo group now had control. It was alleged Michael Taccetta was present at the first meeting at which plans were laid, but it is not known whether he had a face-to-face confrontation with Vastola.

Marchalonis also testified that in order to finalize the agreement, two individuals from Aron & Aron went to New York City to meet with the bosses of various crime

factions to resolve the jurisdictional dispute. Allegedly, the dispute was resolved in favor of the Accetturo organization and an individual named Anthony Consalvo (Tony Chocolate) would be put into the organization and would funnel moneys to Suppa and Accetturo. After it was taken over, the agent testified that Aron & Aron went out of business and a new company was formed with similar individuals with the name of Reets International or Belgium Swiss. Consalvo was identified as an associate of Anthony Accetturo and according to the agent, Taccetta is aware that he is one of Accetturo's people. This information was obtained from various sources as well as the surveillance of the individuals together.

Defendant Accetturo's provided this Court with a deposition taken of Mitchell Aron on October 15, 1985, in Fort Lauderdale, Florida, which has been admitted into evidence. In that deposition, Mitchell Aron, who identified himself as a principal in the Aron & Aron enterprise, now defunct, also identified "Joseph Velonzo" as a principal. He denied any knowledge of the aforementioned recitation, denied having given a 25 percent interest to any of the defendants, denied having been threatened with bodily harm, denied ever having met with Giacomo DiNorscio, and denied meeting with any of the defendants in this matter. In short, he categorically denied the allegations made through the government's witness.

Certainly, Mitchell Aron's testimony gives one serious pause as to the veracity of the government's sources. In response the government presented this Court with a letter and accompanying documents, some of which were under seal. Attached to the government's letter was an information complaint affidavit against Mitchell T. Aron which deals with charges against him involving grand theft and offense against computer users. The document indicates that Aron was arrested on July 31st, 1984 in connection with two counts of grand theft and one offense against computer users. After being read his Miranda rights, Aron stated that he knew who bought the codes and who used them but he did not want to become a stool pigeon. Aron stated that he did not want the subject to go to jail.

As the parties pointed out, the government submitted several documents for this Court's *in camera* inspection. After reading the summary furnished to the defendants, this Court is satisfied that they had been fairly apprised of its contents in accord with the principles laid down in *United States versus Acevedo-Ramos.* The sealed documents were held until today in order to give counsel an opportunity to be heard with respect to any objections they may have had to their admission and in an attempt to refute them. In-camera reading of these documents strongly suggests that the scenario related by Marchalonis is extremely plausible. If anything, yesterday's belated submissions bolster Alonzo's reliability.

I believe that the evidence and proffers are persuasive that defendants Accetturo, Taccetta, and Ricciardi conceived the plan to take over a business and enrich themselves through extortion, threats of violence and violence. This kind of activity prompted Congress in 1970 to enact RICO. This evidence also fortifies the government's allegations regarding the dominant roles defendants Accetturo and Taccetta played in the alleged organization.

Now, the defendants have been apprised of actions which might constitute threatening gestures in this regard. I might say that I am deeply concerned about this. Of course, the defendants are not in a position to know who the individuals are who have been called. I appreciate their predicament. But I would say to all concerned, with no imputation whatsoever, that if any—if any connotation in that regard could possibly be made, that defendant's counsel should carefully discuss this matter with their respective clients and seek to ameliorate the situation immediately.

As discussed previously, the government also introduced for the Court's *in camera, ex parte* consideration two tapes of an oral

communication obtained through court-authorized wiretaps as well as a transcript of these tapes. The tapes contain a conversation of several persons about threats made to potential government witness Michael Esposito and his family by Martin Taccetta and Robert Caravaggio, two of the co-defendants in this case. Relevant to the case before me is the tape's discussion of defendants Accetturo and Taccetta being implored to quell these threats.

The tapes reveal the following series of events. Michael Esposito, who owned a lucrative videotape distribution business in the 1980s, was introduced to Robert Caravaggio and Martin Taccetta in return for a $200,000 loan guaranteed by Martin Taccetta's attorney. Martin Taccetta and Caravaggio were given a share of the business. The two shareholders then began to drain the assets of the business through the purchase of several expensive cars, the drawing of large weekly salaries and the use of company money for other nonbusiness purposes such as dental bills. Martin Taccetta and Caravaggio visited Esposito in his hotel room while he was attending a convention in Chicago, accused him of stealing from the company and demanded $50,000. When Mr. Esposito denied the theft, the two men "worked him over," (beat him up). Subsequently the two men billed to Esposito more of their own personal expenses, including a $2,000 television and VCR for "Tumac".

In late August of 1984, Martin Taccetta and Caravaggio gave Esposito 24 hours to pay them $25,000. He went into hiding but then returned to California upon assurances that his "problem" had been resolved. Upon returning to California, Esposito was forced to sign over the stock he still owned. Caravaggio and Martin Taccetta then threatened other Esposito family members and friends. In discussing these events, the conversation participants noted that Michael and Martin Taccetta were "with Tumac," who "is in Florida now," and that the way to stop the threats was to contact "Tumac" and Michael Taccetta through New York associates. They also stated that Michael Taccetta "runs everything for him ... Tumac never comes in" to New Jersey.

Michael Esposito is presently incarcerated in the Metropolitan Correctional Center in New York City on a civil contempt charge after he refused to testify after being immunized. He has refused to testify concerning matters which are related to this case. Esposito had previously refused to testify before the Grand Jury after being granted immunity by this court. He was cited for contempt and was incarcerated under an order of civil contempt in April of 1985. *See* T. Tr., page 288.

In June of 1985, while at M.C.C., Mr. Esposito petitioned this Court through his then-attorney to release him. In his certification filed with this Court he said, "I want to make it clear to the Court that I truly respect the Court and what the U.S. Attorney's office is attempting to do. However, I have made it clear to the agents of the FBI and to Mr. O'Malley that I will not provide testimony to the Grand Jury for the reason that I would be in fear of my life as well as my family's life. I could never live with myself if, as a result of my cooperation, my family suffered physical reprisals. No amount of imprisonment will change my position."

Agent Marchalonis testified that a confidential source advised him that the group headed by Michael Taccetta in New Jersey specifically knew that Michael Esposito had cooperated with the government and that he realized the seriousness of what he had done and was afraid to testify. Marchalonis also related that the source indicated that the group was not interested in Michael Esposito's desire to remain in prison because since he had spoken once he would speak again and when he would be released he would be "handled." Marchalonis testified that this phrase meant being silenced. I accept his interpretation. The source, according to Marchalonis, had an abundance of knowledge concerning Esposito's present situation, his whereabouts and what had transpired in the court proceedings. Moreover, according to Marchalonis,

this source has been utilized for search warrants that have been successful in obtaining contraband and in finding gambling, loansharking, narcotics and other related criminal activity.

Defendant Michael Taccetta introduced into evidence certain documents indicating that the loan guarantee previously referred to had been given at a time after the alleged beating. He also introduced evidence of a contribution to Nite Flight Video, a subsidiary of Mr. Esposito's former business, CVX, which was dated April 19th, 1984. In addition, he pointed to a document submitted by Michael Esposito by his present attorney to the United States District Court for the Southern District of New York to demonstrate that he had no evidence which would be of value to the Grand Jury.

As pointed out during defendant Taccetta's hearing, this position of Esposito is essentially inconsistent with his previous statements. *See* T. Tr. at page 289. As stated by Taccetta's counsel, "Absolutely one of the positions is a lie." I agree with him. The evidence admitted in this proceeding overwhelmingly demonstrates that as in Aron & Aron, this organization moved in on a business, took it over and utilized threats and violence to achieve their ends. It is highly believable that Michael Esposito genuinely fears for his life and that of his family.

As the *Delker* court pointed out, the legislative history of the Act repeatedly emphasizes that defendants who have threatened witnesses and intimidated victims and potential victims pose a significant danger and should be detained prior to trial. *See Delker*, 757 F.2d at 1400. Here Martin Taccetta, Mr. Caravaggio and Anthony Brescia, who is a close associate with Michael Taccetta, was with Michael Esposito in a motel room on the day he was arrested, as the testimony indicates, dealt with him directly. The evidence is compelling that Michael Esposito was beaten by these two individuals and that the company was looted. There is evidence that even Mr. Accetturo shared in the spoils. It strongly

appears that this entrepreneurial activity was far more than a joint venture on the part of Martin Taccetta and Caravaggio. I am convinced for the purpose of this hearing that Marchalonis' opinion, which is on page 42 of the Taccetta transcript, that Michael Taccetta "lent his weight behind his brother to try to resolve a fighting between rival groups regarding this group" is true. The source testimony, Esposito, himself, the tapes received in camera, information provided by federal and state authorities, particularly in California, lend impressive qualitative weight to the government's contention in this regard. Danger abounds.

A proffer was made by the government before Magistrate Haneke by an unnamed attorney on August 26th, 1985, that the defendants want to know who the "rat" is and that they were looking for the "rat." It is not clear what, if any, weight the magistrate gave this proffer. I feel it is one more reliable indication of defendants' attitude toward "squealers."

Agent Marchalonis also testified that in the first week of September 1985 he had received information concerning a threat to a government witness. He said: "The government witness in question informed me that he was told by an individual who was a person who at first introduced him to other individuals who are presently co-defendants in this matter that these individuals were looking for him and they wanted to talk to him." See Accetturo transcript, page 14. He further testified that another confidential source had advised him of the witness' name "and told me that Michael Taccetta and others within the organization knew that this person was cooperating and that he would have to be handled, which meant to the Court that he would have to be silenced." Accetturo transcript, page 15. Marchalonis emphasized that the source which he had found reliable in the past had come to him with this information. During their respective summations defendants' counsel, in essence, derided the quality of the evidence as scanty. The aforementioned testimony is indicative to

me that the government's proffers and evidence clearly and convincingly revealed a tightly controlled infrastructure which acts collectively with respect to any perceived threat to its existence.

Evidence and proffers were presented under seal to Magistrate Haneke and this Court that certain of the defendants were involved in an attempted murder in 1970 and a successful homicide in 1976. I have carefully considered all the evidence and proffers in this regard and have concluded as to the former episode that I should reject in evidence because I find that it is essentially stale. As to the latter allegation, I am not persuaded at this juncture that I should afford it reliability. Evidence has been presented by the defense, by proffers and material in evidence that there were others who may have had sufficient motivation to commit the crime.

A review of this multiple defendant evidence demonstrates to me that the government's proofs are substantially permeated with a stamp of reliability. Obviously, some of the proofs have greater qualitative weight than others. Taccetta's attorney opined that Alonzo's contributions to this sordid scenario amounted to approximately 25 percent. I do not have to engage in that sort of mathematic computation because I am more than satisfied that I haven't been listening to simply a fantasy woven by the government.

At a trial the government may well fail to sustain its constitutional burden. However, for the purposes of these hearings, I am clearly convinced that the totality of this portion of the evidence demonstrates the existence of a hierarchical organization whose overall boss is Anthony Accetturo. He is also known as "Tumac." Directly under him is Michael Taccetta, who runs the day-to-day operation of the operation in New Jersey subject to Mr. Accetturo's approval. Defendants Perna and Ricciardi have important supervisory responsibilities.

I am also convinced that for the purposes of this hearing that the government as to this evidence has made a sufficient showing that these individuals have been engaged in a pattern of criminality which constitutes a danger to the public and others. As Judge Edelstein remarked in *United States v. Payden,* cited supra at page 1277, "It is well settled that a trier of fact may make inferences from proven facts based on common experience and logic." I believe I have done that. I now turn to a consideration of the individual findings as to each defendant and evaluate them in accordance with the statute as previously stated.

(Recess.)

a. Michael Taccetta.

 As to defendant Michael Taccetta, the government has established the rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," 18 U.S.C. Section 3142(e), by establishing that there was probable cause to believe that the defendant committed a violation of the Controlled Substances Act, 21 U.S.C. Section 801 et seq., punishable by more than ten years' imprisonment. As discussed previously, the government need only present the indictment to establish the probable cause necessary to trigger the presumption. The presumption shifts the burden of production to defendant. *United States v. Jessup,* 757 F.2d 378. As noted earlier, however, there is enough evidence here to even meet the standard set by my esteemed colleague, Judge Diamond, in the Western District of Pennsylvania, in the *Allen* case. I determine, however, that Mr. Taccetta met his burden of production by his proffer that he is employed by Belmont Builders, has one prior conviction for a lottery charge, has been married for 16 years, lives in Florham Park, New Jersey, and is the father of four children.

Since the defendant has met his burden of production, I must now determine whether the government has met its burden of persuasion establishing that no condition or combination of conditions will assure the attendance of the defendant and the safety of others in the community.

Turning to an evaluation of the factors specified in Section 3142(g) of the Act, I find that the government has met its burden with regard to the first factor.

Mr. Michael Taccetta has been charged with conspiring to possess and intent to distribute a Schedule II narcotic, cocaine, conspiring to own an illegal gambling business, conspiring to commit wire fraud. But, more importantly, Mr. Taccetta has also been charged with conspiracy to violate RICO, Section 1962(b), 16 United States Code, Section 1962(b), as well as conducting a racketeering enterprise in violation of RICO. In regard to these charges, the indictment alleges that Mr. Taccetta is the "underboss" of an organized crime group that during the nine-year conspiracy conducted loansharking, extortion, counterfeit credit card scams, gambling operations and extortionate takeovers of legitimate business through systematic use of violence, threats and fiscal and economic intimidation. Moreover, the indictment charges that Mr. Michael Taccetta supervised these activities, resolved disputes and controlled distribution of proceeds and that he personally participated in the extortionate takeover of a Florida gem distribution business, loansharking, infiltration of legitimate businesses, counterfeit credit card fraud and cocaine distribution. These charges, as a whole, are extremely serious. I note especially the drug charge which Section 3142(g)(1) explicitly requires to be considered.

The weight of the evidence, contrary to representations of the defendant, in my judgment is extremely substantial. The government has presented transcripts of tape recordings obtained pursuant to court-authorized electronic surveillance. Agent Marchalonis testified as to corroborated information provided by reliable government witnesses. Further, the government has evidence obtained by physical surveillance.

An evaluation of the evidence presented in terms of the considerations listed in 18 U.S.C. Section 3142(g)(3) tilts the balance heavily in favor of detention. The evidence discussed above indicates that defendant Taccetta is the underboss who leads the New Jersey branch of Anthony Accetturo's alleged crime organization and answers directly to Mr. Accetturo and makes the day-to-day decisions affecting its activities. It also indicates that Mr. Taccetta forced independent bookmakers to work for his organization in the late '70s and early '80s and beat up a bookmaker in the Downneck section of Newark with Mr. Perna and that Taccetta—Mr. Taccetta is involved in administering the organization's loansharking operations. Moreover, the threats made to a government witness in early September as well as the efforts to identify the "rat" which occurred in the last week of August are also, I find, attributable to Mr. Taccetta.

I incorporate by reference in this section my prior findings as to activities conducted by more than one of the defendants. Insofar as Michael Taccetta is concerned, I find he played a dominant role in the Aron & Aron and Esposito and CVX takeovers. While Suppa, Consalvo, Caravaggio and his brother Martin may have done the dirty work, he, I find, played a predominant part in these criminal undertakings. Chief Judge Weinstein's prior words, quoted heretofore, regarding the role of a boss in a criminal enterprise are extremely pertinent here. RICO by its very provisions does not insulate an individual who gives the orders but carefully distances himself to preserve his status so that others may "shine in his eyes." Neither does the Bail Reform Act of 1984. One more topic must be discussed—the threats. There is no doubt in my mind that Michael Taccetta has played a prominent role in the organization with respect to the threats that Mr. Esposito perceived are being directed against him and his family.

In conjunction with the foregoing history, I've also considered evidence that pertains exclusively to Mr. Michael Taccetta. The government produced at the hearing before Magistrate Haneke evidence that Mr. Taccetta had infiltrated legitimate businesses and drove them into fraudulent bankruptcy in the late 1970s and early '80s.

During 1977 to 1978 Mr. Taccetta became a "silent partner" in an outfit known as Nu Concepts Incorporated, and used the company's warehouse to hold meetings with alleged organized crime associates. Nu Concepts went into bankruptcy in 1978 and subsequently its president, unindicted co-conspirator Frank Pisano, was convicted of bank fraud and fraud against the government. The same fate befell Carmatta Oil Company of Whippany New Jersey. Taccetta was frequently seen at Carmatta meeting with alleged organized crime associates. The company went out of business in 1984. This scheme is charged in the racketeering counts of the indictment.

Through its wiretap at the Hole in the Wall Luncheonette the government has recorded a conversation which occurred between Michael Taccetta and Frank Pisano on December 29, 1982. Agent Marchalonis testified that the conversation indicated that Pisano had heard that Taccetta was upset with him over a discrepancy in a gambling wager. After discussing the problem, Taccetta reassured Mr. Pisano saying, "You might get a bad decision but you'll never get a bad rap. Always remember that. In other words, you might get a bad decision. Unintelligible ... but you won't get a bad rap." At the conclusion of the conversation Mr. Pisano told Taccetta, "I would love to shine in your eyes." This conversation corroborates the other evidence and proffers as to Mr. Taccetta's status in the enterprise. There is also testimony in this case related to Agent Marchalonis that Taccetta's minions are frequently seen vying for his attention at a particular restaurant. Servility bespeaks status.

Agent Marchalonis also testified to information from a confidential source that Taccetta was involved in the late '70s with transporting marijuana to the New Jersey area. I find this testimony credible and the information reliable. I have also considered Agent Marchalonis' testimony regarding a conversation he had with Taccetta in June of 1985. Taccetta was present at the firm, Belmont Builders, when Marchalonis and a Secret Service agent executed search warrants on codefendant Victor Cantillo regarding Cantillo's utilization of counterfeit credit cards. The searches were executed at Belmont Builders and at Mr. Cantillo's home. The conversation occurred for approximately three hours at Cantillo's home. In addition to Socrates and the principles by Hachiavelli, Agent Marchalonis and Michael Taccetta discussed recent events concerning the arrest of an FBI agent in California for spying. Agent Marchalonis testified that in response to Marchalonis' remark that the FBI agent was a traitor, Mr. Taccetta agreed and stated that he felt the same sentiments toward people in "his profession" who would do what the FBI agent had done.

I find in light of the foregoing evidence the danger to any other person or the community that would be imposed by defendant Michael Taccetta is very real and extremely serious. The evidence shows Mr. Taccetta's willingness as the alleged underboss of the Taccetta group enterprises to employ threats and violence to insure the expansion and continued operation of the enterprise. The foregoing evidence, but most notably the Aron & Aron and Michael Esposito incidents, graphically illustrate this conclusion.

Considering the totality of these factors, this Court finds that the government has met its burden of establishing by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of Michael Taccetta and the safety of others in the community. I, thus, order that defendant Michael Taccetta be detained without bail pending trial on these charges.

b. Michael Perna.

 Defendant Perna is charged with a very serious offenses in this case, the first factor to be considered. The indictment alleges that defendant Perna conspired to violate RICO and conspired in a racketeering enterprise in violation of RICO. Defendant Perna is also alleged with conspir-

ing to own an illegal gambling business, which is Count 10 in the indictment, and conspiring to commit wire fraud, which is Count 11. The indictment also alleges that Perna served and assisted Michael Taccetta in communicating his orders to other alleged organization members. Moreover, it alleges that Perna also participated in the loansharking operation run under the aegis of the alleged Taccetta group enterprise. These crimes are clearly grave and have violent underpinnings.

The second factor, the weight of the evidence related to these charges is very strong. The government has presented transcripts of court-authorized electronic surveillance as well as corroborated reliable testimony of government witnesses. The government also has physical surveillance evidence showing Mr. Perna meeting with other members of the alleged enterprise in locations in New Jersey and Florida. I also incorporate by reference all previous findings made as to defendant Perna's activities with other defendants in this section.

The application of the evidence presented to the third Section 3142(g) factor also tips the scales heavily in favor of detention. The evidence already discussed shows that: (1) Perna occupied an influential and important position in the inner circle or the alleged Taccetta group enterprise and reported directly to Michael Taccetta; (2) that Perna helped arrange and participated in meetings with co-defendants in Florida and New Jersey; (3) that Perna with Michael Taccetta coerced bookmakers to join that organization through use of violence in the late '70s and early '80s and publicly beat a bookmaker in the Downneck section of Newark; (4) that Mr. Perna was willing to use violence to insure the success of the alleged enterprise's gambling and loansharking operations; and (5) that threats to a government witness made during the first week of September as well as a statement made during the last week of August regarding identifying the "rat" are in part attributable to Perna. In addition to the foregoing history, I have considered the following events in which defendant Perna

is involved, exclusive of the other defendants before me today. Under 3142(g)(3)(A), I considered that Perna is a resident of New Jersey and has been employed as a director of security at Right-O-Way Air Freight which until 1983 was owned by the former brother-in-law of Anthony Accetturo, Raymond Wier. The credible evidence is that he has a no-show job and was getting $800 a week and a late model Cadillac for his use.

A tape recording conducted pursuant to court-authorized surveillance demonstrates the depth of Perna's involvement in the alleged loansharking operation of the enterprise and his willingness to use violence when necessary to collect loan payments. In this conversation Perna was speaking to some of the other codefendants in the case regarding individuals whose names were in a book. Agent Marchalonis testified based on his experience and education in loansharking investigations that the conversants were using terms such as "vig" and "weight" which refer to the interest rate charged on loansharking debts per week. *See* P. Tr. at page 13. In this conversation Perna admonished co-defendant Frank Benedetto, also known as Jackie Ray, about being soft in collecting debts. Perna stated: "But, Jack, ya got to stay on top of these guys, ya have to. I tell ya what I'm gonna to do. When they come in I'm gonna slap them in the [expletive deleted] mouth. I'm gonna to slap every single one of them in the [expletive deleted] mouth."

When Benedetto responded that it was none of Perna's business, Perna retorted, "No, it is my business." Expressing his dismay at the slowness of payment of some of the debtors Mr. Perna stated, "Excuse me a second, here, no, let me tell ya something. There are a lot of," expletive deleted, "stiffs in this," expletive deleted, "book. And they think we're suckers all the time. * * * We're taking the Santa Clause suit or—er uniform off—There are a lot of guys who are going to get hurt." Moreover, Perna urged Mr. Benedetto on in his debt collection saying: "But, Jack, ya got to get them here. I can't go get them,

threaten them, and do everything ya know."

Marchalonis also testified regarding corroborated information from a reliable confidential source which recalled that defendant Perna was responsible for the beating of one George Baker, a jeweler from Verona. The witness stated that someone had given Baker a piece of jewelry to hold for some money. Baker in turn resold the item. When the original owner returned to reclaim the item and Baker informed him of the resale, the individual demanded the profit Baker obtained on the resale. Baker refused. The source related that Perna returned to the jewelry store later, representing the owner and likewise demanding money. Soon thereafter, Baker was beaten behind the store by Michael Perna, according to the source.

The defendant attempts to impeach the government's evidence by casting doubt on Agent Marchalonis' interpretation of the meaning of the tape-recorded conversations and by demonstrating that George Baker was physically bigger in stature than Perna. Defendant attempts to show that his anger with Rocky Budd in that conversation derives from romantic overtures made by this individual, Rocky Budd, to Mr. Perna's wife. Finally, defendant objected strenuously to the admission of the tapes and argues that his speedy trial rights have been implicated by detention in this complex case. Of course, I've already addressed that argument previously in this opinion. I have considered defendant's factual points but I'm not persuaded that they in any way diminish the conclusions I must logically draw from the evidence presented. Namely, the violence that overlays Mr. Perna's activities in the alleged Taccetta enterprise tips the scales heavily in favor of detention in terms of the third Section 3142(g) factor.

As to the fourth factor, I conclude that Mr. Perna poses a serious danger of harm to the community and to other persons. The evidence demonstrates that Mr. Perna is willing to employ dangerous force when necessary to achieve criminal ends. I must infer that these dangerous propensities would continue and would imperil individuals and the community.

In conclusion. I find that pursuant to Section 3142(a) of the Bail Reform Act that no condition or combination of conditions will reasonably assure the safety of any other person in the community. Moreover, I find that clear and convincing evidence supports this conclusion as required by Section 3142(f). I, therefore, order that defendant Michael Perna be detained without bail pending trial on these charges.

c. Thomas Ricciardi.

Defendant Ricciardi is charged with very serious offenses in this case. The indictment alleges that he conspired as a member of the Taccetta Group Enterprise to commit racketeering violations including acts of loansharking, extortion, counterfeit credit card scams, illegal gambling and extortionate business takeovers through violence, threats and intimidation. The indictment specifically alleges that Ricciardi was involved in a loansharking operation which forced over 50 debtors to pay usurious interest rates through threats of physical injury; that Ricciardi beat a Louis Nittolo at a bistro called the Alibi Lounge on Route 22 in Union, New Jersey in connection with a loansharking debtor; and that he was involved in the extortionate takeover of a Florida jewelry business. Moreover, it alleges that Ricciardi oversaw the illegal gambling machine operation run by the Taccetta organization. Violence was an essential element of each of these charges. Therefore, the facts as applied to the first Section 3142(g) factor weigh heavily in favor of detention. I incorporate by reference the findings made earlier as to occurrences involving more than one defendant as to Mr. Ricciardi and will not repeat them here.

The weight of the evidence against defendant Ricciardi is strong. The government evidence includes transcripts of court-authorized tape recordings as well as corroborated reliable testimony of government witnesses. The government also has physi-

cal surveillance reports placing Ricciardi at various locations in New Jersey and Florida with other members of the alleged enterprise.

The defendant's history and characteristics, the third factor to be considered, weigh heavily in favor of detention. In considering the third factor, I know that after Mr. Ricciardi came out of jail he married. He has a family. I believe he lives in Toms River, New Jersey, in that area. He has argued that he has reformed. However, the evidence previously discussed shows that; (1) Mr. Ricciardi occupied a high ranking position in the inner circle of the alleged Taccetta group enterprise and met with other enterprise officials; (2), that Ricciardi felt that violence; for example, putting someone in "blackness," was a suitable way of dealing with numbers operatives like Rocky Budd, who were becoming too independent; (3), that Ricciardi supervised with an iron hand the installation and maintenance of video gambling machines and that only respect for the territory of other alleged organized crime associations would induce him to remove the machine; and (4), that Mr. Ricciardi was part of the inner circle of the alleged Taccetta Enterprise and as one of the defendants who were detained over the weekend of August 24th, 1985 was responsible for the threat made to a government witness during the first week of September for the statement regarding the identification of the "rat" made in late August. In addition to this history, I've considered the following events which defendant Ricciardi was involved in exclusive of the other defendants before me today.

Mr. Ricciardi pleaded guilty in 1977 to an atrocious assault and battery of a South Orange restauranteur, Martin Salzman. This Court considered the South Orange Police Department report and the indictment of the Essex County Grand Jury introduced into evidence which indicated that Mr. Ricciardi assisted four other individuals in beating Salzman as he left his restaurant for Salzman's refusal to serve the men food at closing hour. Defendant claims that this episode was an example of youthful roughnecking even though he was incarcerated for his role. Mr. Ricciardi's subsequent history indicates at this juncture of the case that he has graduated to the school of hardened criminality. I note, once again, Mr. Ricciardi's comment referred to earlier that an individual should be put "in blackness" to substantiate my contention in this regard.

Mr. Ricciardi also pleaded guilty to an atrocious assault and battery upon Mr. Louis Nittolo, as I previously stated, a loansharking debtor who failed to make timely payment. This incident has been included in Count 1 of the indictment. I have considered photographs and statements submitted by the government detailing the intent and the extent of Mr. Nittolo's injuries. I note especially Mr. Nittolo's brother's statement regarding the bloody condition of the bathroom after the beating took place. I also note the statement of Judge Marzulli, presently the Assignment Judge of Essex County, in the sentencing proceedings in this matter, which indicated that although defendant Ricciardi may not have actually struck Mr. Nittoli, himself, Mr. Ricciardi, "did lend ... his stature, his size and his presence." Judge Marzulli stated that he believed Ricciardi would have struck Nittolo if "it became necessary." Further, Judge Marzulli stated that he was sentencing Ricciardi based upon the fact that the beating "was committed as a planned event to get even with Mr. Nittolo for reporting this to the police and you instill fear in him so that this would not happen again in the future." See Government's Exhibit No. 12 at pages 69 and 70.

The Nittolo incident is relevant to the third Section 3412(g) factor, not only as to past criminal history, but as to character. The Nittolo atrocious assault was committed while Ricciardi was on release for a similar charge—the atrocious assault of Mr. Salzman—which occurred only approximately three months before.

A court-authorized wiretap has also obtained a conversation between Mr. Ricciardi and his brother, Joseph Ricciardi. In the

conversation, Thomas Ricciardi called his brother "dangerous" because he won't "put nothing on record." See Government's Exhibit 11, page 6: Thomas Ricciardi warned his brother, "Before you talk to anybody, before you start something, you come and we talk. That's your edge. Maybe we know don't do this, don't do this guy. Maybe we know something you don't. That's supposed to be your edge." The government proffers in this conversation that Thomas Ricciardi is warning his brother that he's jeopardizing the organization by not informing him of his activities. Mr. Ricciardi is further advising his brother to notify the alleged organization of his activities so that it can insure his success. I accept this interpretation that the government offers.

The defendant submits in response to the government's evidence that the two assaults were the result of a poor judgment of, as I said before, of a young roughneck who has substantially matured and improved in character since his marriage and subsequent start of a family. The defendant offered into evidence a resentencing transcript where Judge Marzulli reduced the defendant's sentence as to the Salzman assault. The defendant further submits that the tape-recorded conversations are susceptible of innocent interpretations. However, I am not inclined to dismiss threats of violence, use of violence and statements of the defendant that demonstrate direct involvement in loansharking and video gambling machines so lightly.

As to the last factor of Section 3142(g), I conclude the aforementioned evidence amply indicates that Mr. Ricciardi poses an immediate and serious threat to witnesses and potential government witnesses as well as a threat generally to the community through continuation of alleged loansharking and gambling activities. As there is a significant correlation between prior criminal history and pretrial rearrest, *see Delker* page 1400—I note Mr. Ricciardi's prior arrest and convictions which are in evidence.

In conclusion, I find that pursuant to Section 3142(e) of the Bail Reform Act of 1984 that no condition or combination of conditions will reasonably assure the safety of any other person and the community and I determine that such finding is supported by clear and convincing evidence as required by Section 3142(f). I therefore order that defendant Thomas Ricciardi be detained without bail prior to trial on these charges.

d. Anthony Accetturo.

As to defendant Anthony Accetturo, the government has established the rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," 18 U.S.C. Section 3142(e), by establishing that there was probable cause to believe that Mr. Accetturo committed a violation of the Controlled Substances Act, 21 U.S.C. Section 801 et seq. punishable by more than ten years' imprisonment. As I discussed earlier and with regard to defendant Michael Taccetta, the government need only present the indictment to establish the probable cause necessary to trigger the presumption. The presumption shifts the burden of production to the defendant. *United States v. Jessup*, 757 F.2d 378 (1st Cir.1985). However, as I stated previously with respect to other defendants in this action, there is ample independent evidence to adequately support me in making my finding on the issue of probable cause. I therefore, under the *Allen* case and I believe *United States v. Fisher*, there is enough evidence by either standard and I so find.

I determine, however, that Mr. Accetturo met his burden of production by his proffer before this Court and before Magistrate Kyle below that he is married, he has close ties to the community in Florida, has no history of alcohol or drug abuse, and has conscientiously attended every court proceeding he has been required to attend. I must now determine whether the government has introduced sufficient evidence by direct testimony or proffer to meet its burden of persuasion that no condition or com-

bination of conditions will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. Section 3142(e).

As to the first factor, there can be no doubt that the charges against Mr. Accetturo are very serious. The indictment charges Mr. Accetturo with (1) conspiracy to violate the federal racketeering statute under 18 U.S.C. Section 1962(d); (2) conducting a racketeering enterprise under 18 U.S.C. Section 1962(c); and (3) conspiracy to distribute cocaine and marijuana under 21 U.S.C. Section 846. As noted with regard to defendant Taccetta, the drug charge warrants special consideration under the second Section 3142(g) factor. More importantly, the indictment alleges that Mr. Accetturo is the ultimate head of an alleged crime enterprise, which has branches in both New Jersey and Florida. The indictment alleges Accetturo, in essence, presided over the operation of "cottage industries" involving loansharking, extortion, counterfeit credit card scams, gambling operations and extortionate takeovers of legitimate businesses through systematic use of violence, threats and physical and economic intimidation.

The indictment alleges that as boss, Mr. Accetturo made all decisions as to the overall policy of the organization, was advised as to all of its criminal activities, resolved disputes and received a percentage of the organization's profits in the form of tribute payments. The indictment also charges that on Mr. Accetturo's behalf co-defendants engaged in crimes including the collection of a loanshark debt through physical violence and that Accetturo personally participated in the takeover of a business under the guise of providing protection. Clearly, these charges involve crimes of violence. This violent element cannot fail to persuade me that these charges are, indeed, great ones. I, of course, incorporate by reference my findings made previously as to Mr. Accetturo in which I discussed other defendants; the spillover evidence, if I may so refer to it.

The government has likewise met its burden in establishing the second Section 3142(g) factor. The weight of the evidence against Mr. Accetturo is, indeed, heavy. The government has submitted the corroborated testimony of a confidential witness who I deem to be reliable. Agent Marchalonis testified as to the results of his investigation. This evidence is bolstered by evidence obtained against Mr. Accetturo pursuant to court-authorized electronic surveillance and physical surveillance.

The third subsection (g) factor entails an examination of inter alia Mr. Accetturo's criminal history, character. The first thing I should note is at the time of the arrest of Mr. Accetturo on these charges he was on release pending trial for two other separate federal indictments for mail fraud, sports bribery and tax offenses. Section 3142(g)(3)(B) specifically provides for the consideration of offenses committed by the defendants while released for other offenses.

The evidence discussed above indicates that Mr. Accetturo is at the apex of a hierarchical organization with branches in New Jersey and Florida. Accetturo's underboss, Michael Taccetta, reports directly to him; others in turn report directly to Michael Taccetta. The evidence also shows that Mr. Accetturo communicated with Mr. Taccetta and other members of the alleged organization at the Hole in the Wall Luncheonette. Moreover, Accetturo's preeminent role in the organization is confirmed by Perna's remark referring to Accetturo recorded pursuant to a court-authorized wiretap, which I paraphrase as follows: "When your boss tells you to do something, you do it."

In addition, the government has presented evidence of physical surveillance which shows Anthony Accetturo as meeting with alleged members of the Taccetta enterprise at the Diplomat Hotel in Florida as well as the location in New York. Curiously, when traveling to New York, the surveillance indicated that Mr. Accetturo did not pass through New Jersey. It happens that a subpoena of the State Commission of In-

vestigation is still outstanding as to Mr. Accetturo in this state.

What I stated earlier with respect to Mr. Taccetta's role in the Aron & Aron and Esposito matters applies with equal force to Mr. Accetturo. I find that he was *the* predominant mover in the Aron takeover which was accomplished by extortion, threats of violence and violence. As to the Esposito situation, there is no question in my mind that his approbation was needed for the appropriation of Esposito's business. True, he did not wield his fist or a weapon against any victim. As the credible evidence clearly indicates, he graduated from that status many years ago. Once again, Chief Judge Weinstein's words in the *Columbo*, which I will not repeat, are pertinent.

In a very real sense, Anthony Accetturo, in my judgment, is the most dangerous of all of the four defendants because he makes things happen. I believe that Mr. Accetturo, who I have already found to be the head of this organization, has played a substantial role in generating threats to potential witnesses and other individuals who he suspects represent a threat to the continuing viability of this organization. In the final analysis, like Michael Taccetta, he's the man to see. The threats made to a government witness discussed above must also be attributed, I find, to Mr. Anthony Accetturo.

In conjunction with the foregoing history, I've also considered evidence that applies exclusively to Mr. Accetturo. As Magistrate Kyle took notice of in her hearings below, Mr. Accetturo has an extensive 30-year criminal history in New Jersey between 1956 and 1970. I've examined his "rap sheet," which covers three pages. Certainly under *Delker* and other cases, this evidence should be considered by the Court in making a decision of this sort.

In response to this evidence, the defendant offered the transcript of the proceeding before Magistrate Kyle. Magistrate Kyle notes the defendant's criminal record, his ties to the community and his court appearance record, but fails to make any findings as to his character. The magistrate determined that he was not a flight risk and further determined the imposition of a release condition prohibiting him from violating any state or federal law, finding that such a condition would ameliorate any potential danger to the community by Mr. Accetturo.

In addition, the defendant proffered the transcript of proceedings before the Honorable Edward V. Davis and the Honorable Alcee L. Hastings, my colleagues who sit in the Southern District of Florida, denying the government's motion to revoke Mr. Accetturo's bail in the two federal cases. Moreover, Mr. Accetturo proffered information that during the pendency of the two federal cases, not a single witness has been harmed or killed, despite the fact that Mr. Accetturo knew all the witness' identities. In addition, the defendant proffered the findings and recommendations of Magistrate Peter L. Nimkoff of the Southern District of Florida. Magistrate Nimkoff found that an FBI agent at a hearing before Judge Davis had lied in a hearing before Judge Davis and, therefore, recommended dismissal of the case on prosecutorial misconduct grounds. I have considered these proffers very closely. However, I must conclude that they do little to minimize the overwhelming and damning effects of the other testimony presented. In the aggregate, I conclude that the evidence presented regarding the third Section 3142(g) factor tips the balance in favor of detention.

I finally come to the fourth factor—the nature and seriousness of the danger to any person or the community that would be posed by the person's release. I conclude in light of the multitude of evidence that I have discussed that Mr. Accetturo does, indeed, present a serious danger to the community not merely because of his own potential to personally inflict harm but, as previously stated, because of his exercise of ultimate control and domination over the often violent and predominantly illegal activities of his underlings in the alleged Taccetta group. Considering the evidence in

light of the Section 3142(g) factors, I find that the government has met its burden of establishing by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of Anthony Accetturo and the safety of others and the community. I, therefore, order that defendant Anthony Accetturo be detained without bail pending trial on these charges.

I have determined to detain these four defendants because in the final analysis I believe for reasons previously stated they represent a "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons."

The government's motions are hereby granted.